IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| MARK ROBERTS, ) | Civil Action No. 7:14-cv-00233 | |
| Petitioner, ) | | |
| ) | | |
| v. ) | **MEMORANDUM OPINION** | |
| ) | | |
| UNITED STATES PAROLE ) | | |
| COMMISSION, ) | By: Hon. Michael F. Urbanski | |
| Respondent. ) | United States District Judge | |

Mark Roberts, a federal prisoner proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.[1] Petitioner alleges that his most recent reparole hearing violated due process and the Ex Post Facto Clause of the United States Constitution. Respondent filed a motion for summary judgment, and Petitioner responded, making the matter ripe for disposition. After reviewing the record, the court grants Respondent's motion for summary judgment because Petitioner has not established that he is in custody in violation of federal law.

**I.**

Petitioner is a District of Columbia parole violator serving a 120 month sentence imposed by the United States Parole Commission (the "Commission"). Petitioner alleges that the Commission violated the right to due process and the Constitution's Ex Post Facto clause when it did not apply the District of Columbia Parole Board's ("D.C. Board") 1987 guidelines to calculate his reparole date.

In 1978, the Superior Court of the District of Columbia sentenced Petitioner to life imprisonment for murder and bank robbery. While serving this sentence, Petitioner escaped from prison and committed another bank robbery for which he was convicted and sentenced.

---

[1] Although presently housed in South Carolina, Petitioner filed the petition while incarcerated in the Western District of Virginia. See, e.g., Francis v. Rison, 894 F.2d 353, 354 (9th Cir. 1990) (recognizing jurisdiction is determined at the time an action is filed and that subsequent transfers of prisoners outside the jurisdiction in which they filed actions do not defeat jurisdiction under § 2241).

The Commission paroled Petitioner on November 26, 2007. In July 2010, Petitioner was arrested for committing armed robbery and aggravated assault and battery in South Carolina. He was convicted of those crimes in February 2013 and was sentenced to serve eight years' incarceration concurrent with his federal sentence.

In May 2013, the Commission conducted a parole revocation hearing for Petitioner, and the hearing examiner determined that Petitioner had violated parole by committing the crimes in South Carolina. The examiner determined that the reparole guidelines called for a sentence between 36 to 48 months, but ultimately, the Commission revoked Petitioner's parole, forfeited all of the time spent on parole, and set his presumptive reparole date as July 27, 2020 after he served 120 months. The Commission explained why it imposed a 120 month sentence instead of between 36 to 48 months:

> After review of all relevant factors and information, a decision above the guidelines is warranted because you are a more serious risk than indicated by the guidelines in that due to your history of violent behavior. Your prior record shows a conviction of 1st Degree Murder. While in custody, you escaped and committed a Bank Robbery. While you were on parole, you committed armed robbery of a U.S. Post Office while armed with a weapon, assaulting the victim. Your history of violence and violation behavior supports the above guideline decision.

Petitioner administratively appealed the Commission's decision without success.

## II.

Petitioner argues that the Commission had not premised its revocation decision on the District of Columbia guidelines in existence in 1987, in accordance with 28 C.F.R. § 2.80. Petitioner further argues that, when the Commission erroneously determined the new sentence, it significantly increased the practical length of his incarceration, thereby violating the Ex Post

2

Facto Clause.  Petitioner believes that he was prejudiced because 28 C.F.R. § 2.80 allegedly did not permit the Commission to consider his rehabilitative course work.  Specifically, Petitioner cites his numerous rehabilitative classes completed before his parole release and, after his parole release, having never tested positive for illegal drugs and completing a financial program.  Petitioner asks the court to order the Commission to hold a new hearing in accordance with the 1987 reparole guidelines.

Although the reparole hearing at issue occurred in 2013, Petitioner committed his initial crimes in 1977.  Accordingly, it is the District of Columbia's parole guidelines and laws applicable in 1977 that govern his case, which are presently found at D.C. Code § 24-204(a) and § 24-206(a).  Phillips v. Fulwood, 616 F.3d 577, 580 (D.C. Cir. 2010); see Kingsbury v. Fulwood, 902 F. Supp.2d 51, 57-58 (D.D.C. 2012) ("[A] plaintiff may invoke an ex post facto protection only on the basis of the parole regime that was in effect at the time he committed his offense[s].").  "Those regulations 'requir[ed] only that in exercising its discretion, the board consider a list of factors' like 'the inmate's offense, prior history of criminality, [and] institutional experience,' and did not specify a way to translate the factors into a parole release date." Id. (citations omitted).  Essentially, the D.C. Board enjoyed "almost unbridled" and "totally unfettered" discretion in its parole decisions.  Sellmon v. Reilly, 551 F. Supp. 2d 66, 86 n.15 (D.D.C. 2008) (hereinafter "Sellmon I"); Sellmon v. Reilly, 561 F. Supp. 2d 46, 50 (D.D.C. 2008).  The D.C. Board of Parole adopted guidelines later to channel its discretion, which were published and codified in 1987 (the "1987 Guidelines").  See Sellmon I, 551 F. Supp. 2d at 69-71 (discussing the purpose and operation of the 1987 Guidelines).

3

The Commission assumed the responsibility of making parole release decisions for all eligible District of Columbia Code felony offenders on August 5, 1998, pursuant to the Revitalization Act and D.C. Code § 24-209.[2] "Between 1998 and 2000, the [Commission] drafted new parole regulations and guidelines (the '2000 Guidelines') that it applied to any offender who received an initial parole hearing after August 5, 1998."[3] Sellmon v. Reilly, 551 F. Supp. 2d 66, 72 (D.D.C. 2008).

---

[2] On August 5, 1998, the Commission assumed jurisdiction over District of Columbia Code offenders through the National Capital Revitalization and Self-Government Improvement Act of 1997, Pub. L. No. 105-33, § 11231(a)(1), 111 Stat. 712, 745, D.C. Code § 24-131(a) (the "Revitalization Act"). The Revitalization Act required the Commission to follow the existing parole laws and rules of the District of Columbia but also gave the Commission the same authority previously enjoyed by the D.C. Board to "amend and supplement" the D.C. parole rules and implementing guidelines. See D.C. Code § 24-1231(a). The Commission's amended version of the parole rules and guidelines of the D.C. Board is codified at 28 C.F.R. § 2.80 et seq. The D.C. Board's 1987 guidelines were not part of statutory law but were adopted by the D.C. Board pursuant to its authority "to establish rules and regulations for its procedure." Ellis v. Dist. of Columbia, 84 F.3d 1413, 1415 (D.C. Cir. 1996). These rules were repealed on October 27, 2000, and inasmuch as the D.C. Board's parole guidelines were part of its regulations, the Revitalization Act gave the Commission the power to revise those guidelines when the Revitalization Act gave the Commission "exclusive authority to amend or supplement any regulation interpreting or implementing the parole laws of the District of Columbia with respect to felons . . . ." See D.C. Code § 24-131(a)(1). Apart from the requirement to follow the District's very broad statutory law at D.C. Code § 24-204, Congress neither expressed nor implied any restrictions on the Commission's "amend or supplement" authority for the District's parole regulations.

[3] The court in Sellmon I also explained how the 2000 Guidelines operated:

> Similar to the 1987 Regulations, the 2000 Guidelines use a point score system to determine whether a candidate is presumptively suitable for parole. This system begins with a calculation of the Salient Factor Score ("SFS"), which assesses the degree of risk that a parole candidate will become a recidivist. See 28 C.F.R. §§ 2.80(c)[,] 2.20. The candidate's "criminal conduct (including the nature and circumstances of the current offense) . . . [is then] used to assist the Commission in determining the probable seriousness of the recidivism that is predicted by the Salient Factor Score." Id. § 2.80(c). Like the 1987 Regulations, the 2000 Guidelines also determine the "type of risk" posed by the parole candidate by looking at his or her history of violence, the use of weapon, and/or death of the victim as a result of the candidate's crime. Id. § 2.80(f). Under the 2000 Guidelines, a candidate can receive as many as 7 points based on the "type of risk" factor. Id. . . . .
>
> After calculating both the degree and type of risk posed by an offender, the base point score is converted into a "base guideline range" of months that are added to the parolee's minimum sentence imposed by the court. See [id.] § 2.80(h). Any offender with a base point score of greater than 3 points will, absent superior program achievement, have additional months added to his or her parole eligibility period. Id. §[] 2.80(h)[-](i).

In light of the development of the "almost unbridled" and "totally unfettered" discretionary parole framework, the court finds that Petitioner does not have a direct constitutional liberty interest in parole and that the D.C. parole statutes do not create a liberty interest in either parole release or the establishment of a parole date. See Greenholtz v. Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1 (1979); Anyanwutaku v. Moore, 151 F. 3d 1053, 1059, 331 U.S. App. D.C. 379 (D.C. Cir. 1998). Where there is no liberty interest in parole, "the procedures followed in making the parole determinations are not required to comport with the standards of fundamental fairness." O'Kelley v. Snow, 53 F.3d 319, 321 (11th Cir. 1995).

However, "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." Foucha v. Louisiana, 504 U.S. 71, 80 (1992) (internal quotation marks omitted). A parole board's decisions are subject to limited judicial review to ascertain whether a rational basis for the adverse decision is articulated in the parole board's statement of reasons. See, e.g., Furnari v. Warden, Allenwood Fed. Corr. Inst., 218 F.3d 250, 254 (3d Cir. 2000).

---

After adding the base guideline range to the parole eligibility period, the [Commission] then adds or subtracts months to reflect negative institutional behavior and/or superior program achievement. See [id.] §[] 2.80(j)[-](l). The final range of months is referred to as the "total guideline range," which is "the amount of time [an offender] may expect to serve with continued good conduct and ordinary program achievement." 65 Fed. Reg. 70,663, 70,664 (Nov. 27, 2000). Until a parole candidate has served a period of time equal to the bottom of his total guideline range, the candidate is presumed to be unsuitable for parole. See 28 C.F.R. §[] 2.80(h)[-](i), [](l).

Finally, similar to the 1987 Regulations, the 2000 Guidelines permit the [Commission] to deny parole to a candidate who is presumptively eligible under "unusual circumstances." The 2000 Guidelines provide examples of "unusual circumstances" but do not limit the discretion of the [Commission] to depart on any basis that it classifies as "unusual" except that it cannot have been "fully taken into account in the guidelines." [Id.] § 2.80(n).

Sellmon I, 551 F. Supp. 2d at 72-73.

It was within the Commission's discretion to depart from the presumptive reparole guideline sentence of 36-48 months because Petitioner's case-specific factors were not fully taken into account in the guidelines and were relevant to the parole decision. See Page v. Pearson, 261 F. Supp. 2d 528, 532 (E.D. Va. 2003) (recognizing the Commission has unreviewable discretion to depart from the guidelines when "unusual circumstances" are present). Even though the Commission departed from the guidelines, it specified "in the notice of action the specific factors that it relied on in departing from the applicable guideline or guideline range." Id. For example, the guidelines did not accurately represent Petitioner's history of violent behavior, including first degree murder, escaping custody and committing bank robbery, and, while on parole, committing armed robbery of a U.S. Post Office and assaulting a victim. Accordingly, the court finds that due process was not violated.

Petitioner argues in his second claim that the Commission violated the Ex Post Facto Clause because, at his reparole revocation hearing, the Commission applied its 2000 Guidelines, which allegedly look at punitive factors, instead of the D.C. Board of Parole's 1987 Guidelines, which allegedly look at rehabilitative factors. The Ex Post Facto Clause prohibits laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." U.S. Const. art. I, § 10, cl. 1; Collins v. Youngblood, 497 U.S. 37, 43 (1990). "To fall within the ex post facto prohibition, a law must be retrospective – that is, it must apply to events occurring before its enactment – and it must disadvantage the offender affected by it." Lynce v. Mathis, 519 U.S. 433, 441 (1997) (internal citations and quotations omitted). The central concern of the Ex Post Facto Clause is fair notice to a defendant that the punishment for a crime has increased from what it was when the crime is committed. Weaver v. Graham, 450 U.S. 24, 28 (1981). In

6

determining whether a retroactive change in laws governing parole decisions violates the Ex Post Facto prohibition, the issue is whether the application of the law "creates a significant risk of prolonging [the inmate's] incarceration." Garner v. Jones, 529 U.S. 244, 251(1995).

First, the 2000 Guidelines are not "laws" to which the Ex Post Facto Clause applies; rather, they are merely guides for the Commission's exercise of discretion. See United States v. Booker, 543 U.S. 220, 245-46 (2004) (discussing guidelines which are advisory); Garner, 529 U.S. at 252 (finding that changes in parole procedures do not necessarily implicate the Ex Post Facto Clause); Farmer v. U.S. Parole Comm., 588 F.2d 54, 55-56 (4th Cir. 1978) (noting no ex post facto violation occurred when parole guidelines were changed after sentencing but federal parole statute left suitability for parole to the Commission's discretion); Dufresne v. Baer, 744 F.2d 1543, 1549-50 (11th Cir. 1984) (noting the Commission's guidelines do not have the force of law and so cannot violate the Ex Post Facto Clause).

Second, even if the 2000 Guidelines did carry the force of law, they were not retroactively applied to Petitioner. "To fall within ex post facto prohibition, a law must be retrospective, that is, it must apply to events occurring before its enactment and it must disadvantage the offender affected by it." Lynce v. Mathis, 519 U.S. 443, 441 (1997). "The critical question is whether the law changes the legal consequences of acts completed before its effective date." Weaver v. Graham, 450 U.S. 24, 31 (1981). In this case, the 2000 Guidelines were not applied to events occurring before their effective date because the offenses leading to the revocation of Petitioner's parole occurred in 2010. See Trice v. Reilly, No. 5:08CV31, 2009 U.S. Dist. LEXIS 16179, at *10-11, 2009 WL 514112, at *4 (N.D.W.Va. Mar. 2, 2009) (finding

7

no ex post facto violation where 2000 Guidelines applied to conduct petitioner engaged in 2004, which subsequently resulted in the revocation of his parole).

Third, assuming <u>arguendo</u> that the guidelines were "law" that applied retroactively to Petitioner, he has not established that the application of the 2000 Guidelines created a significant risk of increased incarceration as compared to the D.C. Board's 1987 Guidelines, especially in light of his eight year concurrent sentence for his crimes in South Carolina while paroled. <u>See, e.g.</u>, <u>Garner</u>, 529 U.S. at 255. The 2000 Guidelines consist of individualized factors such as the offender's prior record of parole supervision, his conduct while on parole, and his institutional conduct, which are the same factors that the D.C. Board would have taken into account in determining whether to grant or deny parole. Additionally, similar to the Commission's guidelines, the D.C. Board's 1987 guidelines permitted the Board to depart from the guidelines "in unusual circumstances." <u>See, e.g.</u>, <u>McRae v. Hyman</u>, 67 A.2d 1356 (D.C. 1995) (upholding D.C. Board's departure from the guidelines for repeat violent offender). Therefore, Petitioner can only speculate as to whether or not the D.C. Board would have exceeded its guidelines, and such speculation is insufficient to sustain an ex post facto claim. <u>See, e.g.</u>, <u>California Dep't of Corr. v. Morales</u>, 514 U.S. 499, 509 (1995) (demonstrating a "speculative and attenuated possibility . . . of increasing the measure of punishment" will not support an ex post facto claim). Also, the D.C. parole laws did not require that Petitioner's participation in institutional programs be a determinative factor in parole decisions. <u>See</u> D.C. Code § 24-404(a); <u>Bogan v. District of Columbia Bd. of Parole</u>, 749 A.2d 127, 129 (D.C. 2000) (upholding D.C. Board's denial of parole even though prisoner completed all of the programs that the Board had required him to complete); <u>Duckett v. U.S. Parole Comm'n</u>, 795 F. Supp. 133, 135 (M.D. Pa. 1992) (citing

8

institutional programming as one factor to determine parole). Instead, in deciding whether to grant parole to a prisoner, the D.C. Board was required to use its discretion to determine "whether the prisoner is likely to be a responsible citizen if he is returned to the community and whether the release on parole is consistent with public safety[,]" which is the discretion now vested with the Commission. White v. Hyman, 647 A.2d 1175, 1179 (D.C. 1994). The D.C. Board, like the Commission, was instructed that participation in institutional programming was not to be a determinative factor in parole decisions.[4] Additionally, the D.C. Board, like the Commission, was granted broad discretion to decide whether to grant parole. Accordingly, Petitioner's argument that examining his post-incarceration behavior under the 2000 Guidelines instead of the D.C. regulations resulted in additional incarceration is also mere speculation, and his ex post facto claim fails.

### III.

For the foregoing reasons, the court grants Respondent's motion for summary judgment. Based upon the court's finding that Petitioner has not made the requisite substantial showing of a denial of a constitutional right as required by 28 U.S.C. § 2253(c), a certificate of appealability is denied.

Entered: June 5, 2015

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

---

[4] Petitioner completed all but two of the institutional courses before he was initially paroled in November 2007, and the other two courses were completed in 2013 after the Commission's decision. Therefore, all of Petitioner's listed courses were irrelevant to the Commission's decision.

9